## UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF TEXAS
### MIDLAND DIVISION

| | |
|---|---|
| ERMA WILSON<br><br>     *Plaintiff,*<br><br>v.<br><br>MIDLAND COUNTY, TEXAS; WELDON "RALPH" PETTY, JR., sued in his individual capacity; and ALBERT SCHORRE, JR., sued in his individual capacity,<br><br>     *Defendants.* | Civil Action No. <u>7:22-cv-00085</u><br><br>**Complaint and Jury Demand** |

## COMPLAINT FOR DECLARATORY AND RETROSPECTIVE RELIEF

Plaintiff Erma Wilson ("Erma") hereby sues Midland County, Texas ("Midland County" or the "County"), Weldon "Ralph" Petty, Jr. ("Petty"), and Albert Schorre, Jr. ("Schorre") (collectively, the "Defendants") for their deprivation of Plaintiff's rights under the Fourteenth Amendment to the United States Constitution.

## Introduction

1.      The United States was founded upon the basic principles of separation of powers and checks and balances. As the Founders wrote, "there is no liberty[] if the power of judging be not separated from the legislative and executive powers." THE FEDERALIST NO. 78 (Alexander Hamilton) (quoting Montesquieu). If judges merged with

executive officers, the Founders feared, "the judge might behave with all the violence of an oppressor." THE FEDERALIST NO. 47 (James Madison) (quoting Montesquieu).

2. Despite the longstanding command that the branches must be separate— meaning a person's judge cannot also be their prosecutor—Midland County, Texas and former District Attorney Schorre employed Ralph Petty as an Assistant District Attorney by day and a law clerk to Midland County's judges by night. For nearly 20 years, Petty served as several judges' right-hand advisor, engaging in *ex parte* communications and surreptitiously drafting opinions and orders in the prosecution's favor in more than 300 cases.

3. In 2021, the Texas Court of Criminal Appeals determined that Petty's conflict of interest amounted to a structural due process violation, completely undermining confidence in the fairness and accuracy of the criminal process.

4. For Plaintiff Erma Wilson, this due process violation resulted in a felony record and cost her a career in the profession she dreamed of since she was nine years old—nursing. This lawsuit is filed to vindicate Erma's rights and the Constitution's fundamental principles.

## **Jurisdiction and Venue**

5. This is a civil rights suit brought under the Fourteenth Amendment to the United States Constitution and the Civil Rights Act of 1871, Rev. Stat. § 1979, as amended, 42 U.S.C. § 1983.

6.      The Plaintiff seeks declaratory relief and compensatory and punitive money damages. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 2201, and 2202.

7.   Venue is proper in this Court under 28 U.S.C. § 1391.

## The Parties

8.      Plaintiff Erma Wilson is a citizen of the United States, a former resident of Midland County, Texas, and a current resident of Travis County, Texas. Her constitutional right to due process was violated when a Midland County prosecutor, Petty, worked as a law clerk to Judge John G. Hyde on her criminal case.

9.      Defendant Midland County is a Texas County Government. Midland County's policymakers knew about and expressly endorsed Petty's dual role as a prosecutor and a law clerk to the same judges he practiced before for nearly two decades, creating an official policy or custom.

10.      Defendant Petty is a former Assistant District Attorney ("ADA") for Midland County, Texas. He served as an ADA from 2001 to 2019. During that period, Petty was also a law clerk to various State District Court Judges for Midland County ("District Judges"), including Judge Hyde, who adjudicated Erma's case.

11.      Defendant Schorre is the former District Attorney ("DA") for Midland County who hired Petty as an ADA in 2001. Schorre hired Petty knowing Petty would

have a dual role as a prosecutor and a law clerk to the same judges he would be practicing before. He never disclosed this relationship to defendants or their counsel.

## Factual Allegations

### Erma Wilson is a life-long Texan and caregiver.

12.     Erma was born in Midland, Texas in 1976.

13.     She is the mother of three children, all of whom were born in Midland, and a grandmother of two.

14.     She left Midland for Austin, Texas in 2008, where she and her family live today.

15.     Erma has spent her life caring for the sick and elderly as a Certified Nursing Assistant, home health aide, and medical assistant. For much of her career, Erma specialized in hospice care, ensuring that those nearing death received the compassion, comfort, and care they needed.

16.     Erma is an essential member of the medical community; however, because of the actions described herein, she has been unable to achieve her dream of becoming a registered nurse.

### Erma was arrested and convicted of possession of a controlled substance.

17.     On August 24, 2000, Erma was with friends in an area of Midland commonly known as "the Flats" when her group was approached by two police officers.

18.     The officers approached Erma's group because they were in a high crime area, which the officers apparently deemed suspicious.

19.     Knowing that even seemingly innocuous police encounters could end in arrest or violence, Erma broke from the group and walked away, as was her right.

20.     The officers shouted after Erma. The officers' pursuit alarmed her, particularly because she had done nothing to warrant police attention. She was afraid and did not want to interact with the officers, yet they kept chasing her, so Erma ran.

21.     Erma eventually stumbled and fell to the ground, and the officers arrested her.

22.     After Erma was placed in a patrol car, officers claimed they found a bag containing a rock-like substance—later determined to be crack cocaine—on the ground near where Erma had been.

23.     Both officers later admitted at trial that: (1) they did not see Erma throw or drop anything during the pursuit, (2) they never saw Erma in possession of the substance, (3) Erma did not appear to be under the influence of any substance, (4) Erma did not have any drug paraphernalia on her, and (5) Erma did not have exclusive control of the area where the drugs were allegedly found.

24.     Yet, they accused Erma of possessing a controlled substance.

25.     Erma truthfully told the officers that the drugs were not hers.

26.     In response, the officers tried to coerce Erma into telling them who the drugs belonged to, telling her she would be released if she identified the owner.

27.     Erma truthfully told the officers that she did not know whose drugs they were.

28.     So the officers took her to jail for possession of a controlled substance.

29.     The Midland County District Attorney's Office offered Erma a probation sentence in exchange for a guilty plea.

30.     Accepting a plea deal, however, would have required Erma to falsely admit to possession of a controlled substance—a crime she did not commit.

31.     Therefore, maintaining her innocence, Erma rejected the prosecution's offers and took her case to trial.

32.     Erma's case was assigned to Judge Hyde, who served as a District Judge for the 238th District Court for Midland County. Judge Hyde is now deceased.

33.     During pretrial proceedings, Erma's counsel filed a motion to suppress the crack cocaine, arguing that the officers did not have probable cause to arrest her, and, therefore, any tangible evidence connected to her arrest should be suppressed.

34.     On March 6, 2001, Judge Hyde denied Erma's motion, finding that flight alone was a sufficient basis for her arrest.

35.     Through counsel, Erma filed a motion requesting that the court reconsider its order denying her motion to suppress.

6

36.     Judge Hyde denied this motion on May 3, 2001.

37.     Following a jury trial at which the disputed evidence—the crack cocaine—was introduced and highlighted, Erma was found guilty of "possession of a controlled substance, to-wit: cocaine," a second-degree felony, and received an eight-year suspended sentence.

38.     Judge Hyde signed the order of judgment, setting forth the terms of Erma's community supervision, on July 20, 2001.

39.     Erma filed a motion for a new trial on August 8, 2001, but that motion was denied.

40.     Even though she received a suspended sentence, Erma pursued an appeal, reasserting her innocence. Through counsel, Erma argued that the trial court erred in denying her motion to suppress and that the evidence was legally and factually insufficient to support her conviction.

41.     The court of appeals affirmed the judgment and sentence. *Wilson v. Texas*, No. 08-01-00319-CR, 2003 WL 1564237 (Tex. Crim. App. Mar. 27, 2003). With respect to the motion to suppress, the court held that Erma had not properly preserved the issue for appeal, so the court did not reach the merits of the claim. *Id.* at *2–*3. With respect to the factual sufficiency of the evidence, the court found that it survived the extremely deferential review accorded to jury verdicts. *Id.* at *5.

42.     The mandate issued on September 11, 2003, and Erma did not further appeal her conviction.

**Erma's future was derailed by the felony conviction.**

43.     Since she was nine years old, Erma has had one dream: to become a registered nurse ("RN").

44.     Prior to her conviction, Erma was actively pursuing her RN. Taking the first steps toward that goal, Erma became a Certified Nursing Assistant ("CNA") in 1997.

45.     After her conviction, however, Erma's plans were derailed.

46.     To work as an RN in Texas, individuals must obtain a license from the Texas Board of Nursing. 22 Tex. Admin. Code § 213.28. Under the Texas Administrative Code, "[a]n individual is subject to denial of licensure for . . . a felony that is directly related to the practice of nursing," including drug related offenses. *Id*. § 213.28(b), (d)(5).

47.     Therefore, as a person convicted of felony possession of a controlled substance, Erma knew she could not obtain a nursing license in Texas.

48.     Erma was devastated when she realized she would not be able to become an RN because of her criminal record.

49.     Unable to pursue her RN, Erma found other ways to stay in the medical field. Following her conviction, Erma continued to work as a CNA and a home health aide for more than 15 years. She specialized in elder and hospice care, caring for others in their final days.

50.     In 2016, Erma went back to school to become a medical assistant, which she completed in August 2017. She received her state certification in 2021 and continues to work as a medical assistant today.

51.     Despite Erma's qualifications and eagerness to work, she has often had trouble finding a job because of her felony conviction. Employers expressed concerns about her conviction for possession of crack cocaine and worried that she would not be a reliable employee.

52.     Because of those difficulties, Erma has at times struggled to make ends meet and provide for her children.

53.     In an effort to make up for her criminal history, Erma took professional classes and participated in training programs. For example, she took classes on public speaking and interviewing so that she could best present herself during interviews and encourage hiring managers to look beyond her felony conviction.

54.     It is only through her hard work and determination that Erma has managed to work in the medical field and provide for her family despite the obstacles that her felony record created.

55.     If Erma had not been convicted of possession of a controlled substance, she would be an RN today. In fact, Erma would likely be working toward becoming a nurse practitioner.

56.     Although Erma is grateful for her current career as a medical assistant, she still wants to become an RN. If the felony conviction were removed from her record, Erma would immediately pursue the necessary qualifications and apply for a nursing license with the Texas Board of Nursing.

57.     Erma's employers have praised her talents as a medical care provider and agree that she would make an excellent RN.

**ADA Petty spent his career working from both sides of the bench.**

58.     The State of Texas granted Weldon "Ralph" Petty, Jr. a license to practice law in 1973.

59.     In March 2000, Midland County began paying Petty for legal work he performed for District Judges, including Judge Hyde.

60.     Petty worked as a paid law clerk for the District Judges, advising them on legal matters and drafting the judges' orders and opinions.

61.     While the State of Texas funds the base salary for district judges, counties supplement that base salary and counties pay the operating costs of their district courts.

62.     Petty sent invoices for his work for the District Judges to the District Courts of Midland County, Texas, and his payments were processed through the Midland County Treasurer's office.

63.     In early 2001, DA Schorre hired Petty as an ADA for Midland County, knowing about Petty's employment with the District Judges.

64.    On or about February 12, 2001, Petty signed an employment contract with the Midland County District Attorney's Office, which expressly noted that Petty "shall be permitted to continue the performance of legal services for the District Judges of Midland County, Texas and perform such work for the said District Judges as they shall desire and be paid for the same as ordered by the District Judges."

65.    A true and correct copy of Petty's February 12, 2001 employment contract is attached as Exhibit A.

66.    At no point did Schorre disclose Petty's dual role to defendants or their counsel. Nor did Schorre attempt to stop or prevent Petty from working as a law clerk for the District Judges.

67.    One of Petty's primary responsibilities for the District Attorney's Office was representing the prosecution in opposing defendants' state habeas corpus petitions.

68.    One of Petty's primary responsibilities for the District Judges was researching, advising, and preparing rulings in response to state habeas corpus petitions.

69.    In 2002, Judge Hyde asked Midland County Attorney Russell Malm "whether or not Mr. Petty could receive additional pay in addition to his district attorney salary for doing work for the District Judges on habeas corpus cases."

70.    County Attorney Malm responded on behalf of the County on August 14, 2002, deciding that Petty could "be paid for this additional work."

71.     A true and correct copy of County Attorney Malm's letter is attached as Exhibit B.

72.     In 2008, Midland County elaborated on Petty's dual role in response to an Internal Revenue Service ("IRS") audit that asked why Petty received both a W-2 and a 1099 from the County.

73.     Former Midland County DA Teresa Clingman was the First Assistant District Attorney at the time Petty was hired, and she, like Schorre, knew about his employment with the District Judges at the time Petty was hired by the District Attorney's Office.

74.     In response to the IRS's request for additional information, Clingman explained that the County paid Petty for both his role as a prosecutor and his role as a law clerk to the District Judges. Clingman noted that when "a writ of habeas corpus is filed, post-conviction, [Petty] responds to it for the judges, at their discretion or assignment." She did not disclose that Petty opposed those same habeas petitions on behalf of the prosecution.

75.     A true and correct copy of Clingman's response to the IRS is attached as Exhibit C.

76.     While a significant portion of Petty's work as an ADA concerned representing the prosecution against defendants' habeas corpus petitions, Petty worked on cases at all stages of prosecution. Petty also regularly advised fellow prosecutors on

their cases, worked with them on case strategies, and, on information and belief, reviewed fellow prosecutors' drafts prior to filing.

77.    Petty was involved in almost every case prosecuted by the District Attorney's Office in some capacity, often as an advisor on prosecution strategies and arguments.

78.    While a significant portion of Petty's law clerk duties consisted of advising, researching, and drafting rulings on defendants' state habeas petitions, Petty also advised, performed legal research for, and wrote orders and opinions for District Judges at all stages of the criminal process.

79.    At times, District Judges would privately visit Petty in his office at the District Attorney's Office to seek his advice and opinions on cases.

80.    Invoices reflect that District Judges paid Petty for performing law clerk duties—while the District Attorney's Office also paid him as a prosecutor—from 2001 to 2014 and in 2017 and 2018.

81.    Petty retired in 2019.

82.    In total, the County paid Petty more than $250,000 for his work as a law clerk. These payments were in addition to the salary the County paid Petty as an ADA.

83.    During his career, Petty was both the lead prosecutor and the law clerk on more than 300 cases.

84.     In addition to the cases on which he was the lead prosecutor, Petty was also the law clerk on cases prosecuted by the District Attorney's Office (his full-time employer) where he was not the lead prosecutor or did not formally appear on behalf of the District Attorney's Office.

85.     Even on cases where Petty was not the lead prosecutor or did not formally appear on behalf of the District Attorney's Office, he acted as a law clerk on cases where his employer was one of the parties, all the while advising prosecutors on almost every case.

86.     On information and belief, Petty worked exclusively on criminal matters in his role as a law clerk, even though he could have worked on civil cases, which would not have resulted in him working as a law clerk in cases he was actively prosecuting or where his own employer was a party.

87.     Both federal and state codes of ethics prohibit law clerks from working on cases where a former, current, or future employer is a party because doing so, at best, gives the appearance of impropriety and, at worst, sacrifices the law clerk's ability to act impartially.

88.     Petty's dual role and conflict of interest were not disclosed to defendants until after Petty retired.

**Petty's misconduct was disclosed only after his retirement.**

89.     In August 2019, current Midland County DA Laura Nodolf discovered Petty's dual role when reviewing accounting records.

90.     Invoices revealed what the County long knew—that Petty was working for and being paid by District Judges while also working as an ADA.

91.     Further investigation of Petty's conflict of interest revealed that, in addition to having regular *ex parte* communications with District Judges on cases prosecuted by the District Attorney's Office, Petty surreptitiously drafted hundreds of orders and opinions for District Judges, resolving countless consequential disputes in the prosecution's (i.e., his employer's) favor.

92.     The investigation also revealed that Petty used unique formatting and styling when drafting documents for District Judges. The styling employed by Petty was not used by the court or others in the District Attorney's Office. For instance, Petty used asterisks (*) in lieu of section symbols (§) on the caption page and a monospaced font:



93.     After discovering Petty's conflict, DA Nodolf sent undated letters to many, but not all, of the defendants whose cases were affected by Petty's dual role.

94.     A true and correct copy of one such letter is attached as Exhibit D.

95.     In each letter, DA Nodolf acknowledged the conflict of interest and that the conflict potentially violated the rules of ethics. For example, one letter read:

> I am writing to tell you about some information we learned about the writ of habeas corpus you or your attorney filed in Midland County. Ralph Petty, an Assistant District Attorney, was the lawyer responsible for working on your case in our office. While he worked on your writ for this office, he was also paid by the District Judges of Midland County to work on your writ. The current District Attorney and staff were not aware Mr. Petty was being paid by the District Courts until after Mr. Petty had retired from the office. This is a potential violation of the rules of ethics for attorneys. If you have further questions about any impact this might have on your case, we suggest you consult with an attorney. The Midland County District Attorney's Office cannot provide legal advice to you, but we can provide documentation upon request.

96.     After this misconduct was revealed, Petty filed a "Motion for Acceptance of Resignation as Attorney and Counselor at Law in Lieu of Disciplinary Action" in the Supreme Court of Texas. In April 2021, the Court found that Petty engaged in professional misconduct and concluded that his "resignation is in the best interest of the public, the profession and Weldon Ralph Petty, Jr." It therefore canceled Petty's law license and prohibited him from the practice of law in the State of Texas.

97.     A true and correct copy of the Supreme Court of Texas's decision is attached as Exhibit E.

**The Texas Court of Criminal Appeals holds Petty's dual role violated due process.**

98.     In 2020, former Texas prisoner Clinton Lee Young filed a writ of habeas corpus based on Petty's conflict of interest.

99.     Seventeen years earlier, in 2003, Mr. Young was convicted of capital murder and sentenced to death following a trial at which Petty worked as both an ADA for Midland County and a law clerk for the District Judge on his case, Judge Hyde.

100.    Mr. Young argued that Petty's previously undisclosed conflict of interest resulted in structural error that denied Mr. Young his constitutional right to due process.

101.    Following an evidentiary hearing, the 385th District Court of Midland County found that Petty, while a prosecutor for the County, engaged in *ex parte* communications with Judge Hyde, which contributed to rulings favorable to the prosecution.

102.    A true and correct copy of the District Court's decision is attached as Exhibit F.

103.    The court further found that DA Schorre knew about Petty's conflict of interest and failed to disclose it.

104.    Based on these findings, the court held that Mr. Young's "federal and state due process rights were violated by . . . both the trial court's use of prosecutor Ralph Petty's services as a paid law clerk during Mr. Young's trial . . . and the prosecution's

withholding of that arrangement, which prevented Mr. Young from moving to recuse or disqualify the trial judge and/or the Midland DA."

105.    The court explained, in part, that "[*e*]*x parte* contact between a party and the trial judge violates due process because it erodes the appearance of impartiality and jeopardizes the fairness of the proceeding."

106.    Based on its findings of fact and conclusions of law, the district court recommended that Mr. Young's conviction be vacated.

107.    In September 2021, the Texas Court of Criminal Appeals ("TCCA") unanimously agreed with the district court. *Ex parte Young*, No. WR-65137-05, 2021 WL 4302528 (Tex. Crim. App. Sept. 22, 2021) (unpublished). Vacating Mr. Young's conviction, the TCCA held that:

> Judicial and prosecutorial misconduct—in the form of an undisclosed employment relationship between the trial judge and the prosecutor appearing before him—tainted Applicant's entire proceeding from the outset. As a result, little confidence can be placed in the fairness of the proceedings or the outcome of Applicant's trial. . . . The evidence presented in this case supports only one legal conclusion: that Applicant was deprived of his due process rights to a fair trial and an impartial judge.

**Erma's constitutional right to due process was likewise violated.**

108.    Like Mr. Young, Erma was a victim of Petty's conflict of interest.

109.    However, Erma did not receive a letter from DA Nodolf. Erma did not learn of Petty's role in her case until April 2021. Erma's due-process injuries were not discoverable before early 2021 because Petty's dual role was not public knowledge until

news media began covering Mr. Young's writ application. The earliest widespread coverage of Mr. Young's application appeared in a *USA Today* article in February 2021.

110.    The County's records show that Petty invoiced Judge Hyde for work he performed on Erma's case while he was employed by the DA's office.

111.    The Abstract of Disposition and Judgment entered in her case also bear Petty's unique formatting and style, demonstrating that Petty drafted these documents affirming the jury's verdict and imposing the terms of Erma's sentence.



112.    True and correct copies of the Abstract of Disposition and Judgment are attached as Exhibits G and H.

113.    Petty had *ex parte* communications with Judge Hyde concerning Erma's case.

114.    On information and belief, Petty worked as a law clerk to Judge Hyde on Erma's case throughout her criminal proceedings.

115.    On information and belief, Petty advised Judge Hyde regarding Erma's case.

116.    Neither Erma nor her counsel were informed that Petty was working for Judge Hyde on her case.

117.    On information and belief, Petty had access to documents and information generally unavailable to prosecutors because of his role as a law clerk in Erma's case.

118.    On information and belief, Petty communicated with and advised fellow prosecutors in the District Attorney's Office regarding Erma's case.

119.    On information and belief, Petty also communicated with and advised fellow prosecutors in the District Attorney's Office regarding Erma's appeal.

120.    As the DA at the time of Erma's trial and the person who signed off on Petty's dual role, Schorre knew or should have known that Petty was working as a law clerk on Erma's case.

121.    Neither Erma nor her counsel were informed that Petty was working for Judge Hyde on her case.

122.    If Erma had known about Petty's involvement as a law clerk in her case, she would have requested Judge Hyde's recusal and a new trial.

123.    Because of Petty's role as a law clerk in Erma's case, little confidence can be placed in the outcome of her criminal proceedings. Principally, Petty was serving as a law clerk on a case where his employer was a party. Both the Federal Judicial Center and

the Supreme Court of Texas recognize that such action is a conflict of interest that erodes impartiality.

124.    Further undermining confidence in Erma's criminal proceedings, Petty and Judge Hyde engaged in *ex parte* communications concerning Erma's case. Petty was given access to information from both Judge Hyde and the District Attorney's Office that the defense did not have access to. Consequential motions, such as Erma's motion to suppress, were resolved in the prosecution's favor throughout trial. And despite the weak evidence against her, Erma's motion for a new trial was not granted. Any of these facts by itself undermines the integrity of Erma's trial. Together, these facts eviscerate it.

125.    The court of appeals' decision upholding Erma's conviction does nothing to restore confidence in the proceedings, particularly given the deferential standard of review that appellate courts employ when considering a verdict's factual sufficiency. To the contrary, Erma's appeal further supports her innocence, the importance of her motion to suppress to the outcome of her trial, and the factual weaknesses of the prosecution's case against her.

126.    But for the blatant due process violations in her criminal trial, Erma would not have been convicted.

127.    Erma has spent more than 20 years (and counting) suffering the consequences of a crime she did not commit.

**Injury To Plaintiff**

128.    By denying Erma her right to due process, the Defendants have directly and proximately caused severe harms to Erma, including but not limited to:

a.  Harms to her pocketbook.

    i.  The Defendants' actions prevented Erma from pursuing a career in her chosen profession of nursing, which has diminished her earning capacity over the past 20 years.

    ii.  The Defendants' actions have inhibited and continue to inhibit Erma's ability to obtain gainful employment due to employers' hesitation against hiring people with felony convictions.

    iii.  The Defendants' actions also required Erma to expend money on attorney fees and court costs related to her defense.

b.  Harms to her quality of life and pursuit of happiness.

    i.  The Defendants' actions prevented Erma from pursuing a career in nursing, which has been her dream since childhood. Instead of realizing this attainable goal, Erma had to pursue jobs that she found less fulfilling and less financially secure.

    ii.  The Defendants' actions have also caused Erma extreme stress concerning living with a felony record, resulting in an overall decline in her physical and emotional health.

iii. The Defendants' actions have also caused Erma extreme stress concerning her ability to care for and provide for her children and her family, resulting in an overall decline in her physical and emotional health.

c. Harms to her access to justice. The Defendants' actions forced Erma to endure and expend time and costs caused by an unconstitutional process.

d. Harms to her family life. The Defendants' actions made it more difficult for Erma to provide for her family and caused her children to worry that the State would take them from her.

e. Harms to her faith in the criminal justice system. The Defendants' actions have caused Erma to lose faith in the criminal justice system in Texas, a place she has called home her entire life.

f. Harms to her reputation. The Defendants' actions have labeled Erma as a felon—a status she is required to report regularly and to people she respects and whose respect she wants in return, such as employers.

### Causes of Action

### Count I
### 42 U.S.C. § 1983 – Fourteenth Amendment
### (Due Process Claim Against Midland County)

129.    Erma realleges and incorporates the allegations in Paragraphs 1 through 128 of this complaint as if fully stated herein.

130.    The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution requires a fair trial in a fair, impartial tribunal.

131.    The right to a fair tribunal not only requires that the judge and law clerk be impartial in fact, but it also requires that trial proceedings avoid even the appearance of partiality.

132.    An employment relationship between the judge and prosecutor, which enables the prosecutor to engage in *ex parte* communications with the judge on his own cases and cases in which his employer is a party, deprives defendants of due process.

133.    Through its policymakers, Midland County adopted and enforced an official employment policy or custom of permitting a prosecutor to work as a law clerk to the judges in cases he was also prosecuting and in cases in which his employer was a party.

134.    Through its policymakers, Midland County also adopted and enforced an official policy or custom of concealing the fact that one of its prosecutors served as a law

clerk to the judges in cases he was also prosecuting and in cases in which his employer was a party.

135.    With Midland County's policymakers' knowledge and consent, Petty worked as a law clerk in Erma's trial while also working for the District Attorney's Office and, on information and belief, advising on the prosecution of her case.

136.    This dual role violated due process by depriving Erma of a criminal proceeding free from either actual or perceived bias.

137.    Petty was not in fact, or did not have the appearance of, a neutral law clerk without a personal stake in the outcome of Erma's case. As an ADA, he had either an actual or perceived interest in ensuring that disputes and cases were resolved in the prosecution's favor.

138.    Further, Petty's role as a law clerk allowed Petty to engage in *ex parte* communications with Judge Hyde and gave him access to defense documents generally unavailable to prosecutors, compromising the fairness of Erma's criminal's proceedings.

139.    The average law clerk in Petty's position would not be able to view both the defense and prosecution equally in light of their primary employment as an ADA.

140.    Judge Hyde was not in fact, or did not have the appearance of, a neutral adjudicator without a personal stake in the outcome of Erma's case. Because of his personal relationship with Petty, he had either an actual or perceived interest in ruling in favor of the prosecution.

141.    Judge Hyde had an existing, ongoing employment relationship with Petty, who, as an ADA for Midland County, represented the opposing party in Erma's case.

142.    The average judge in Judge Hyde's position would not be able to view both parties equally in light of this relationship.

143.    In his role as law clerk to Judge Hyde in Erma's case, Petty engaged in *ex parte* communications with Judge Hyde concerning Erma's case, eroding the appearance of impartiality and jeopardizing the fairness of the proceedings.

144.    Petty's arrangement as both a law clerk and ADA was not merely a one-time occurrence, but it lasted for nearly 20 years, was approved of by the County Attorney, was endorsed by multiple District Attorneys, was signed off on by County Treasurer Jo Ann Carr, and was even reported to the IRS as a part of the County's operations and budgets.

145.    The actions of Petty, Schorre, County Attorney Malm, and County Treasurer Carr are attributable to the County. As final policymakers with decision-making authority, these individuals made a deliberate employment decision to allow a prosecutor to work from both sides of the bench and taint the impartiality of every proceeding where Petty served as a law clerk.

146.    The actions of Petty, Schorre, County Attorney Malm, and County Treasurer Carr are attributable to the County. As final policymakers with decision-

making authority, these individuals repeatedly made a deliberate decision to permit Petty's dual role and conceal that dual role from defendants.

147.    In the alternative, if policymakers for the County did not make the decision allowing Petty to serve in a dual role, violating due process, then they failed to oversee Petty in acting as both a prosecutor and a law clerk. DA Schorre knew that Petty intended to do work for District Judges, as did County Attorney Malm. And County Treasurer Carr was responsible for paying Petty for both roles, reporting all income to the IRS, and providing Petty with a W-2 for his role as a prosecutor and a 1099 for his role as law clerk.

148.    As an ADA, Petty was a municipal policymaker, and his employment decisions and actions described in this complaint represent official Midland County policy.

149.    As DA, Schorre was a municipal policymaker, and his employment decisions and actions described in this complaint represent official Midland County policy.

150.    As County Attorney, Russell Malm was a municipal policymaker, and his decisions and actions described in this complaint represent official Midland County policy.

151.    As County Treasurer, Jo Ann Carr was a municipal policymaker, and her decisions and actions described in this complaint represent official Midland County policy.

152.    Endorsement of Petty's dual role, and the decision to not disclose the same to defendants, was the County's official policy or custom, violating due process.

153.    Erma's felony conviction resulted from a criminal proceeding tainted by this structural due process violation, causing the harms outlined in Paragraph 128.

**Count II**
**42 U.S.C. § 1983 – Fourteenth Amendment**
**(Due Process Claim Against Petty)**

154.    Erma realleges and incorporates the allegations in Paragraphs 1 through 128 of this complaint as if fully stated herein.

155.    The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution requires a fair trial in a fair, impartial tribunal.

156.    The right to a fair tribunal not only requires that the judge and law clerk be impartial in fact, but it also requires that trial proceedings avoid even the appearance of partiality.

157.    Due process further requires prosecutors to protect defendants' due process rights, including disclosing exculpatory evidence and conflicts of interest.

158.    An employment relationship between the judge and prosecutor, which enables the prosecutor to engage in *ex parte* communications with the judge on his own cases and cases in which his employer is a party, deprives defendants of due process.

159.    Petty worked as a law clerk in Erma's case while also working for the District Attorney's Office, which is a blatant, clearly established violation of due process.

160.   In his role as a law clerk in Erma's case, Petty engaged in *ex parte* communications with Judge Hyde and advised him on a case in which his employer was a party, and he drafted orders and judgments, which Judge Hyde then signed. And, on information and belief, Petty advised the prosecution regarding her case. This employment relationship and dual role were never disclosed to Erma or her counsel.

161.   Petty's dual role violated due process by depriving Erma of a criminal proceeding free from either actual or perceived bias.

162.   Petty was not in fact, or did not have the appearance of, a neutral law clerk without a personal stake in the outcome of Erma's case. As an ADA, he had either an actual or perceived interest in ensuring that disputes and cases were resolved in the prosecution's favor.

163.   Further, Petty's role as a law clerk gave Petty access to defense documents generally unavailable to prosecutors, compromising the fairness of Erma's criminal proceedings.

164.   In his role as law clerk to Judge Hyde in Erma's case, Petty engaged in *ex parte* communications with Judge Hyde concerning Erma's case, eroding the appearance of impartiality and jeopardizing the fairness of the proceedings.

165.   The average law clerk in Petty's position would not be able to view the defense and prosecution equally in light of their primary employment as an ADA.

166.    Erma's felony conviction resulted from a criminal proceeding tainted by this structural due process violation, causing the harms outlined in Paragraph 128.

**Count III**
**42 U.S.C. § 1983 – Fourteenth Amendment**
**(Due Process Claim Against Schorre)**

167.    Erma realleges and incorporates the allegations in Paragraphs 1 through 128 of this complaint as if fully stated herein.

168.    The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution requires a fair trial in a fair, impartial tribunal.

169.    The right to a fair tribunal not only requires that the judge and law clerk be impartial in fact, but it also requires that trial proceedings avoid even the appearance of partiality.

170.    Due process further requires prosecutors to protect defendants' due process rights, including disclosing exculpatory evidence and conflicts of interest.

171.    An employment relationship between the judge and prosecutor, which enables the prosecutor to engage in *ex parte* communications with the judge on his own cases and cases in which his employer is a party, deprives defendants of due process.

172.    Schorre hired Petty knowing about his employment relationship with the District Judges, including Judge Hyde.

173.    Schorre expressly endorsed Petty's employment relationship with the District Judges.

174.   As DA, Schorre benefited from Petty's employment relationship with the District Judges, which enabled Petty to have *ex parte* communications with the District Judges, gain access to information unavailable to the defense, and draft orders and rulings in the prosecution's favor.

175.   Schorre's decision to hire Petty as an ADA knowing about—and endorsing—his employment with the District Judges violated due process.

176.   As outlined in Counts I and II, Petty's dual role compromised the neutrality of Erma's criminal proceedings. Even though Schorre knew or should have known that Petty was working as a law clerk in Erma's case, he permitted Petty to continue working as both an ADA and a law clerk for Judge Hyde. This is a blatant, clearly established violation of due process.

177.   Erma's felony conviction resulted from a criminal proceeding tainted by this structural due process violation, causing the harms outlined in Paragraph 128.

### Prayer for Relief

**WHEREFORE**, Plaintiff respectfully requests that this Court enter a judgment (1) declaring that the Defendants violated her rights under the Fourteenth Amendment to the United States Constitution, and (2) awarding her compensatory and punitive money damages against Midland County, Weldon "Ralph" Petty, Jr., and Albert Schorre, Jr. Plaintiff also seeks her attorney fees and costs under 42 U.S.C. § 1988, as well as all other and further relief as the Court may deem just and proper.

## Jury Demand

Plaintiff demands a trial by jury on all issues triable under Rule 38 of the Federal

Rules of Civil Procedure.


Dated: April 11, 2022                    Respectfully submitted,

                                         /s/ Anya Bidwell
                                         Anya Bidwell (TX Bar No. 24101516)
                                         Robert J. McNamara*
                                         Alexa L. Gervasi*
                                         Jaba Tsitsuashvili*
                                         INSTITUTE FOR JUSTICE
                                         901 N. Glebe Rd., Suite 900
                                         Arlington, VA  22203
                                         Tel.: (703) 682-9320
                                         Email: abidwell@ij.org
                                                 rmcnamara@ij.org
                                                 agervasi@ij.org
                                                 jtsitsuashvili@ij.org

                                         *Attorneys for Plaintiff*

                                         *Motions for Admission *Pro Hac Vice*
                                         to Be Filed