UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
MIDLAND DIVISION

ERMA WILSON

       *Plaintiff*,

v.

MIDLAND COUNTY, TEXAS;
WELDON "RALPH" PETTY, JR.,
sued in his individual capacity; and
ALBERT SCHORRE, JR., sued in his
individual capacity,

       *Defendants*.

Civil Action No. 7:22-cv-0085-DC-RCG

## PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION TO DISMISS OF DEFENDANTS MIDLAND COUNTY AND WELDON "RALPH" PETTY, JR.

Alexa L. Gervasi* (NY Bar No. 5536925)
Jaba Tsitsuashvili* (CA Bar No. 309012)
Robert J. McNamara* (VA Bar No. 73208)
Anya Bidwell (TX Bar No. 24101516)
INSTITUTE FOR JUSTICE
901 N. Glebe Rd., Suite 900
Arlington, VA  22203
Tel.: (703) 682-9320
Email: agervasi@ij.org
      jtsitsuashvili@ij.org
      rmcnamara@ij.org
      abidwell@ij.org

*Admitted *Pro Hac Vice*

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................ii

INTRODUCTION .................................................................................................................1

STANDARD OF REVIEW .....................................................................................................1

BACKGROUND ...................................................................................................................1

ARGUMENT ........................................................................................................................8

   I.     Erma is not in custody; therefore, *Heck v. Humphrey* does not bar her claims ...........................8

   II.    Erma properly alleged harms resulting from Defendants' misconduct. ....................................11

   III.   Erma alleged that Midland County had a nearly two-decades-long policy or custom of allowing Petty to work as both a prosecutor and law clerk in violation of due process ..........12

   IV.   Petty is not entitled to immunity from suit. ...................................................................15

        A.  Neither prosecutorial nor judicial immunity shield Petty from accountability. ..............15

           i.    Petty is not entitled to prosecutorial immunity. .......................................................15

           ii.   Petty is not entitled to judicial immunity ................................................................16

        B.  Petty is not entitled to qualified immunity. ...................................................................18

   V.    Erma's claim accrued, at the earliest, in February 2021 when she first had reason to know that Defendants deprived her of due process. ..................................................................19

CONCLUSION ....................................................................................................................20

CERTIFICATE OF SERVICE ..............................................................................................22

# TABLE OF AUTHORITIES

**CASES**                                                                                                          **Page(s)**

*Ashcroft v. Iqbal,*
　　556 U.S. 662 (2009)................................................................................................................1

*Bennett v. City of Slidell,*
　　735 F.2d 861 (5th Cir. 1984)................................................................................................13

*Black v. Hathaway,*
　　616 F. App'x 650 (5th Cir. 2015) .......................................................................................11

*Board of County Commissioners v. Brown,*
　　520 U.S. 397 (1997)..............................................................................................................13

*Brown v. Bryan County,*
　　219 F.3d 450 (5th Cir. 2000)................................................................................................14

*Brown v. Lyford,*
　　243 F.3d 185 (5th Cir. 2001)................................................................................................14

*Buckley v. Fitzsimmons,*
　　509 U.S. 259 (1993)........................................................................................................15, 16

*Carey v. Piphus,*
　　435 U.S. 247 (1978)..............................................................................................................12

*Carr v. O'Leary,*
　　167 F.3d 1124 (7th Cir. 1999) ............................................................................................10

*Cinel v. Connick,*
　　15 F.3d 1338 (5th Cir. 1994)...............................................................................................15

*Cohen v. Longshore,*
　　621 F.3d 1311 (10th Cir. 2010) ..........................................................................................10

*Ex parte Young,*
　　No. WR-65137-05, 2021 WL 4302528 (Tex. Crim. App. Sept. 22, 2021) ..................7, 18

*Forrester v. White,*
　　484 U.S. 219 (1988)........................................................................................................16, 17

*Hall v. Small Business Administration,*
　　695 F.2d 175 (5th Cir. 1983)................................................................................................19

*Harden v. Pataki,*
　　320 F.3d 1289 (11th Cir. 2003) ..........................................................................................10

*Heck v. Humphrey,*
    512 U.S 477 (1994) ............................................................................8, 9, 10, 11

*Hendershott v. Strong,*
    753 F. App'x 320 (5th Cir. 2019) ......................................................................12

*Hill v. City of Pontotoc,*
    993 F.2d 422 (5th Cir. 1993) ........................................................................ 11, 12

*Hope v. Pelzer,*
    536 U.S. 730 (2002) ..............................................................................................18

*Huang v. Johnson,*
    251 F.3d 65 (2d Cir. 2001) ..................................................................................10

*In re Murchison,*
    349 U.S. 133 (1955) ........................................................................................ 18, 19

*Kozam v. Emerson Electric Co.,*
    739 F. Supp. 307 (N.D. Miss. 1990) ..................................................................11

*Lewis v. Casey,*
    518 U.S. 343 (1996) ..............................................................................................12

*McCoy v. Alamu,*
    141 S. Ct. 1364 (2021) .........................................................................................18

*MCI Telecommunications Corp. v. United Showcase, Inc.,*
    847 F. Supp. 510 (N.D. Tex. 1994) ....................................................................11

*Mitchell v. McBryde,*
    944 F.2d 229 (5th Cir. 1991) ..............................................................................17

*Monell v. Department of Social Services,*
    436 U.S. 658 (1978) ........................................................................................ 13, 14

*Muhammad v. Close,*
    540 U.S. 749 (2004) ...................................................................................9, 10, 11

*Nonnette v. Small,*
    316 F.3d 872 (9th Cir. 2002) ..............................................................................10

*Omega Hospital, LLC v. United HealthCare Services, Inc.,*
    No. 16-cv-560, 2020 WL 7049857 (M.D. La. Dec. 1, 2020) ............................11

*Pete v. Metcalfe,*
    8 F.3d 214 (5th Cir. 1993) ...................................................................................19

*Powers v. Hamilton County Public Defender Commission,*
    501 F.3d 592 (6th Cir. 2007)................................................................10

*Randell v. Johnson,*
    227 F.3d 300 (5th Cir. 2000)......................................................... 10, 11

*Safford Unified School District No. 1 v. Redding,*
    557 U.S. 364 (2009)......................................................................19

*Singleton v. Cannizzaro,*
    956 F.3d 773 (5th Cir. 2020)..............................................................16

*Society of Separationists, Inc. v. Herman,*
    939 F.2d 1207 (5th Cir. 1991) ............................................................10

*Spencer v. Kemna,*
    523 U.S. 1 (1998)..................................................................9, 10, 11

*Stewart v. Tilley,*
    No. 6:15-cv-7, 2017 WL 5665336 (W.D. Tex. Nov. 27, 2017) ....................18

*Stump v. Sparkman,*
    435 U.S. 349 (1978)......................................................................16

*Taylor v. Riojas,*
    141 S. Ct. 52 (2020)......................................................................18

*Tumey v. Ohio,*
    273 U.S. 510 (1927)......................................................................18

*United States v. Jordan,*
    49 F.3d 152 (5th Cir. 1995)...............................................................19

*Villarreal v. City of Laredo,*
    17 F.4th 532 (5th Cir. 2021) ..............................................................18

*Wearry v. Foster,*
    33 F.4th 260 (5th Cir. 2022) ......................................................... 15, 16

*Westfall v. Luna,*
    903 F.3d 534 (5th Cir. 2018)..............................................................18

*Wilson v. Birnberg,*
    667 F.3d 591 (5th Cir. 2012)................................................................1

*Wilson v. Johnson,*
    535 F.3d 262 (4th Cir. 2008)..............................................................10

*Wilson v. State*,
    No. 08-01-00319-CR, 2003 WL 1564237 (Tex. Crim. App. Mar. 27, 2003) .....................................3

**RULES AND STATUTES**

42 U.S.C. § 1983 ....................................................................................................................*passim*

Fed. R. Civ. P. 12(b)(6) .............................................................................................1, 12, 13

Tex. R. Prof'l Conduct 3.03–.05 ...............................................................................................19

**OTHER AUTHORITIES**

*Code of Conduct for Law Clerks and Staff Attorney*
    *of the Supreme Court of Texas* ..............................................................................................19

Federal Judicial Center,
    *Maintaining the Public Trust: Ethics for Federal Judicial Law Clerks* ........................................................19

Plaintiff Erma Wilson ("Erma") respectfully submits this response in opposition to the 12(b)(6) Motion to Dismiss of Defendants Midland County, Texas ("Midland County" or the "County") and Weldon "Ralph" Petty, Jr. ("Petty") (collectively, the "Defendants").

## INTRODUCTION

For nearly 20 years, Ralph Petty spent his days as an Assistant District Attorney for Midland County and his nights working as a law clerk to the same Midland County judges he practiced before, both in his own cases and in other cases where the Midland County District Attorney's Office was a party. Over those two decades, Petty and Midland Country surreptitiously deprived hundreds of criminal defendants of due process, including Plaintiff Erma Wilson. Now that Defendants' unconstitutional conduct has finally come to light, Erma seeks to vindicate her rights through the only avenue the law affords—a civil suit under 42 U.S.C. § 1983. Erma has stated a claim against both Petty and Midland County; therefore, the Motion to Dismiss should be denied.

## STANDARD OF REVIEW

In reviewing a motion to dismiss under Rule 12(b)(6), courts must accept all facts in the complaint as true and construe them in the light most favorable to the plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court does not need to determine whether the plaintiff's victory is *probable*; it must only determine whether, taking the plaintiff's alleged facts as true, victory is *plausible. Wilson v. Birnberg*, 667 F.3d 591, 600 (5th Cir. 2012). Therefore, "[d]ismissal is improper if the allegations support relief on any possible theory." *Id.* at 595 (internal quotation omitted).

## BACKGROUND

Erma Wilson has dreamed of becoming a registered nurse ("RN") since she was just nine years old. Compl. ¶ 43. Defendants impeded that dream, however, when they violated her constitutional right to due process by prosecuting Erma (for a crime she did not commit) in a system tainted by Defendants' conflicts of interest.

*Erma's Future was Derailed by an Unjust Conviction*

In 2000, Erma was charged with possession of a controlled substance after officers allegedly found crack cocaine on the ground near where Erma previously stood. *Id.* ¶¶ 22–28. At the time, the officers told Erma that they would let her go free if she told them who the drugs belonged to. *Id.* ¶ 26. Erma did not know, so she was arrested, even though both officers later admitted that: (1) they never saw Erma in possession of the substance; (2) they did not see Erma throw or drop anything on the ground; (3) Erma did not appear to be under the influence of any substance; (4) Erma did not have any drug paraphernalia on her; and (5) Erma did not have exclusive control of the area where the drugs were allegedly found. *Id.* ¶¶ 23, 27–28.

Although the Midland County District Attorney's Office offered Erma a probation sentence in exchange for a guilty plea, Erma rejected the offer. *Id.* ¶¶ 29–31. Instead of falsely admitting to a crime she did not commit, Erma maintained her innocence and proceeded to trial, where her case was assigned to the late Judge Hyde of the 238th District Court for Midland County. *Id.* ¶¶ 29–32.

As part of her pre-trial proceedings, Erma filed a motion to suppress the crack cocaine, which Judge Hyde denied. *Id.* ¶¶ 33–34. He also denied her motion for reconsideration. *Id.* ¶¶ 35–36. Following a jury trial at which the disputed evidence—the crack cocaine—was introduced and emphasized, Erma was found guilty of "possession of a controlled substance, to-wit: cocaine," a second-degree felony, and received an eight-year suspended sentence. *Id.* ¶ 37.

Judge Hyde signed the order of judgment, setting forth the terms of Erma's community supervision, on July 20, 2001. *Id.* ¶ 38. Erma then filed a motion for a new trial, which was also denied. *Id.* ¶ 39.

Even though she received only a suspended sentence, Erma continued defending her innocence, filing an appeal based on the trial court's denial of her motion to suppress and the insufficiency of the evidence against her. *Id.* ¶ 40. However, the court of appeals affirmed the judgment

and sentence, finding the first argument unpreserved[1] and that the second argument failed to surmount the extremely deferential review accorded to jury verdicts. *Id.* ¶ 41.

With her conviction and sentence affirmed by the court of appeals, Erma's fate was sealed— she would not be able to fulfill her dream of becoming an RN in Texas due to Texas Administrative Code § 213.28, which provides that "[a]n individual is subject to denial of licensure for . . . a felony that is directly related to the practice of nursing," including drug-related offenses such as Erma's. *Id.* ¶¶ 43–47. Erma was devasted.

Unable to become an RN, Erma found other ways to stay in the medical field. For instance, she worked as a Certified Nursing Assistant—a job she held prior to her conviction—and a home health aide for 15 years, specializing in elder and hospice care. *Id.* ¶¶ 44, 49. Then, in 2016, Erma went back to school to become a medical assistant; she recently received her state certification and continues to work as a medical assistant today. *Id.* ¶ 50. It is only through her hard work and determination that Erma has managed to continue her work in the medical field and provide for her family despite the obstacles that her felony record created. *Id.* ¶ 54.

If Erma had not been convicted of possession of a controlled substance, she would be an RN today. *Id.* ¶ 55–56. As Erma's employers agree, she would make an excellent RN. *Id.* ¶ 56–57.

### With the County's Approval, Petty Works Both Sides of the Bench

In March 2000, Midland County began paying Petty—then a Texas-licensed attorney—for legal work he performed for various State District Court Judges for Midland County ("District Judges"), including Judge Hyde. *Id.* ¶¶ 58–59. Specifically, Midland County—through its Treasurer's

---

[1] Defendants suggest that Erma's counsel merely claimed "no objection" to the substance's admission. ECF 16 at 9. But they don't disclose that Judge Hyde expressly recognized a running objection to its admission. *See Wilson v. State*, No. 08-01-00319-CR, 2003 WL 1564237, at *2–*3 (Tex. Crim. App. Mar. 27, 2003). Further, the fact remains that the court of appeals did not consider the merits of Erma's motion to suppress or whether the court erred in allowing the evidence into trial.

Office—paid Petty to work as a law clerk to the District Judges, including advising them on legal matters and drafting the judges' orders and opinions. *Id.* ¶¶ 60–62.

In early 2001, while Petty was still working as a law clerk, Midland County District Attorney Al Schorre ("Schorre") hired Petty as an assistant district attorney ("ADA") for Midland County, knowing about Petty's employment with the District Judges. *Id.* ¶ 63. In fact, on or about February 12, 2001, Petty signed an employment contract with the Midland County District Attorney's Office that expressly noted that "Petty shall be permitted to continue the performance of legal services for the District Judges of Midland County, Texas and perform such work for the said District Judges as they shall desire and be paid for the same as ordered by the District Judges." *Id.* ¶¶ 64–65 & Ex. A. While Petty's permission to work for the District Judges was without any qualification, or any concern for potential conflicts, Midland County was careful to limit Petty's employment with other attorneys to exclude any employment that "shall conflict with the duties of the Office of the District Attorney of Midland County." *Id.* ¶ 65 & Ex. A.

One of Petty's primary responsibilities for the District Attorney's Office was representing the prosecution in opposing defendants' state habeas corpus petitions. *Id.* ¶ 67. Likewise, one of Petty's primary responsibilities for the District Judges was researching, advising, and preparing rulings in response to state habeas corpus petitions. *Id.* ¶ 68. In 2002, Judge Hyde asked Midland County Attorney Russel Malm "whether or not Mr. Petty could receive additional pay in addition to his district attorney salary for doing work for the District Judges on habeas corpus cases." *Id.* ¶ 69. County Attorney Malm responded on behalf of the County, deciding that Petty could "be paid for this additional work." *Id.* ¶¶ 70–71 & Ex. B.

Then, in 2008, Midland County elaborated on Petty's dual role in response to an Internal Revenue Service ("IRS") audit that asked why Petty received both a W-2 and a 1099 from the County. *Id.* ¶ 72. Former Midland County District Attorney Teresa Clingman explained that the County paid

Petty for both his role as a prosecutor and his role as a law clerk to the District Judges. *Id.* ¶¶ 73–74. Clingman noted that when "a writ of habeas corpus is filed, post-conviction, [Petty] responds to it for the judges, at their discretion or assignment," but she did not disclose that Petty opposed those same habeas petitions on behalf of the prosecution. *Id.* ¶¶ 74–75 & Ex. C.

While a significant portion of Petty's work as an ADA concerned representing the prosecution against defendants' habeas corpus petitions, Petty worked on cases at all stages of prosecution. *Id.* ¶ 76. Petty also regularly advised fellow prosecutors on their cases, worked with them on case strategies, and, on information and belief, reviewed fellow prosecutors' drafts prior to filing. *Id.* In other words, Petty was involved in almost every case prosecuted by the District Attorney's Office in some capacity, often as an advisor on prosecution strategies and arguments. *Id.* ¶ 77.

Likewise, while a significant portion of Petty's law clerk duties consisted of advising, researching, and drafting rulings on defendants' state habeas petitions, Petty also advised, performed legal research for, and wrote orders and opinions for District Judges at all stages of the criminal process. *Id.* ¶ 78. At times, District Judges would even privately visit Petty in his office at the District Attorney's Office to seek his advice and opinions on cases. *Id.* ¶ 79.

Invoices reflect that District Judges paid Petty for performing law clerk duties—while the District Attorney's Office also paid him as a prosecutor—from 2001 to 2014 and in 2017 and 2018. *Id.* ¶ 80. All told, the County paid Petty more than $250,000 for his work as a law clerk, in addition to the salary the County paid Petty as an ADA. *Id.* ¶ 82. And during his career, Petty worked as both the lead prosecutor and the law clerk on more than 300 cases. *Id.* ¶ 83. This number says nothing of the countless additional cases where Petty worked as a law clerk while his full-time employer, the District Attorney's Office, was a party and Petty was advising the prosecutors of record. *Id.* ¶¶ 84–85.

Petty's dual role and conflict of interest were not disclosed to defendants until well after Petty's 2019 retirement. *Id.* ¶¶ 81, 88.

### *Petty's Misconduct is Finally Disclosed*

In August 2019, current Midland County District Attorney Laura Nodolf discovered invoices that revealed what the County long knew—that Petty spent nearly two decades working for and being paid by District Judges while also working as an ADA. *Id.* ¶¶ 89–90. Further investigation of Petty's conflict of interest revealed that, in addition to having regular *ex parte* communications with District Judges on cases prosecuted by the District Attorney's Office, Petty surreptitiously drafted hundreds of orders and opinions for District Judges, resolving countless consequential disputes in the prosecution's (i.e., his employer's) favor. *Id.* ¶ 91. The investigation also revealed that Petty uniquely formatted the documents he drafted for District Judges—using a sui generis style not used by the court or others in the District Attorney's Office. *Id.* ¶ 92. For instance, Petty used asterisks (*) in lieu of section symbols (§) on the caption page and a monospaced font. *Id.*

After discovering Petty's invoices, Nodolf sent undated letters to many, but not all, of the defendants whose cases were affected by Petty's dual role, acknowledging the conflict of interest and that the conflict potentially violated the rules of ethics. *Id.* ¶¶ 93–95 & Ex. D.

After this misconduct was publicly revealed, Petty filed a "Motion for Acceptance of Resignation as Attorney and Counselor at Law in Lieu of Disciplinary Action" in the Supreme Court of Texas. *Id.* ¶¶ 96–97 & Ex. E. The Court found that Petty engaged in professional misconduct and concluded that his "resignation is in the best interest of the public, the profession and Weldon Ralph Petty, Jr." *Id.* It therefore canceled Petty's law license and prohibited him from the practice of law in the State of Texas. *Id.*

### *The Texas Court of Criminal Appeals Finds a Constitutional Violation*

In 2020, former Texas prisoner Clinton Lee Young filed a petition for a writ of habeas corpus based on Petty's conflict of interest. *Id.* ¶ 98. Seventeen years earlier, in 2003, Mr. Young was convicted of capital murder and sentenced to death following a trial at which Petty worked as both an ADA for

Midland County and a law clerk for the District Judge on his case, Judge Hyde. *Id.* ¶ 99. In his habeas petition, Mr. Young argued that Petty's previously undisclosed conflict of interest resulted in a structural error that denied Mr. Young his constitutional right to due process. *Id.* ¶ 100.

In September 2021, the Texas Court of Criminal Appeals (the "TCCA") unanimously agreed, vacating Mr. Young's conviction and holding that:

> Judicial and prosecutorial misconduct—in the form of an undisclosed employment relationship between the trial judge and the prosecutor appearing before him—tainted Applicant's entire proceeding from the outset. As a result, little confidence can be placed in the fairness of the proceedings or the outcome of Applicant's trial. . . . The evidence presented in this case supports only one legal conclusion: that Applicant was deprived of his due process rights to a fair trial and an impartial judge.

*Id.* ¶ 107 (quoting *Ex parte Young*, No. WR-65137-05, 2021 WL 4302528 (Tex. Crim. App. Sept. 22, 2021) (unpublished)).

### Defendants Likewise Violated Erma's Constitutional Rights

Like Mr. Young, Erma was a victim of Petty's conflict of interest. *Id.* ¶ 108. However, Erma did not receive a letter from Nodolf disclosing Petty's misconduct. *Id.* ¶ 109. She did not learn of Petty's role in her case until April 2021, shortly after *USA Today* published an exposé regarding Mr. Young's case and Petty's conflict.

The County's records show that Petty invoiced Judge Hyde for work he performed on Erma's case while he was employed by the DA's office. *Id.* ¶ 110. And the Abstract of Disposition and Judgment entered in her case bear Petty's unique formatting, demonstrating that Petty drafted these documents affirming the jury's verdict and imposing the terms of Erma's sentence. *Id.* ¶¶ 111–12 & Exs. G, H. On information and belief, Petty worked as Judge Hyde's law clerk throughout Erma's criminal proceedings, advising Judge Hyde on her case. *Id.* ¶¶ 114–15.

As a law clerk, Petty engaged in *ex parte* communications with Judge Hyde concerning Erma's case. *Id.* ¶ 113. And, on information and belief, he had access to documents and information generally unavailable to prosecutors, while also communicating with and advising his fellow prosecutors in the

District Attorney's Office regarding Erma's case, both at trial and on appeal. *Id.* ¶¶ 117–20. Yet, no one informed Erma or her counsel of Petty's dual role. *Id.* ¶¶ 116, 120–21.

If Erma had known of Petty's involvement as a law clerk in her case, she would have requested Judge Hyde's recusal and a new trial. *Id.* ¶ 122. Instead, she was convicted in a dubious trial—where the law clerk was also employed by the opposing party—*because* the law clerk was also employed by the opposing party. *Id.* ¶¶ 123–26. As a result, Erma has spent the last 20 years (and counting) suffering the consequences of a crime she did not commit. *Id.* ¶¶ 127–28.

Defendants' actions violated Erma's Fourteenth Amendment right to due process; she therefore filed this 42 U.S.C. § 1983 lawsuit for declaratory and retrospective relief.

## ARGUMENT

Defendants raise five arguments against Erma's claims,[2] none of which hold water.

## I. Erma is not in custody; therefore, *Heck v. Humphrey* does not bar her claims.

The *Heck* bar does not apply to Erma's claims because Erma could not have challenged Petty's previously undisclosed misconduct through habeas proceedings or on appeal.[3]

In *Heck v. Humphrey*, the Supreme Court addressed whether a state court prisoner, still in custody, could file a Section 1983 lawsuit against the prosecutors and investigators who allegedly destroyed exculpatory evidence, leading to his conviction. 512 U.S 477, 478–79 (1994). In other words, the prisoner's lawsuit—though it did not seek release from custody as a remedy—challenged the

---

[2] Defendants open their Motion to Dismiss with a semi-veiled *ad hominem* attack against Erma and her motivations, accusing her of "attempt[ing] to turn[] this belief [in her innocence] to cash." ECF 16 at 1. But turning harms caused by constitutional violations into "cash" in the form of compensatory damages is, in fact, a primary function of Section 1983. Erma makes no apologies for seeking a remedy using the remedial statute Congress provided.

[3] In their second point, Defendants characterize Erma's complaint as arguing that her conviction should be treated as constructively vacated because Mr. Young's conviction was reversed based on Petty's misconduct. ECF 16 at 7–8. Erma makes no such argument and at no point represents that her conviction has been reversed. *See generally* Compl. ¶¶ 98–107. Therefore, she addresses Defendants' first two points as a single argument concerning *Heck*'s application to this case.

legality of his conviction. *Id.* at 479. The issue, the Court explained, is that two separate statutes compete for attention in federal-court prisoner litigation—Section 1983 and the federal habeas corpus statute. *Id.* at 480. And, the Court determined, Section 1983—"a species of tort liability"—was not the appropriate vehicle for challenging the validity of outstanding criminal judgments. *Id.* at 483, 485–86. Instead, it concluded that prisoners should challenge their convictions through the process set forth in the federal habeas corpus statute, and only if the prisoner can prove that the conviction or sentence has been reversed, expunged, invalidated, or called into question may he pursue a Section 1983 claim. *Id.* at 487–88; *see also id.* at 498 (Souter, J., concurring) (explaining that a state prisoner must "follow habeas's rules before seeking § 1983 damages"). Today, this rule is commonly referred to as the "favorable-termination requirement."

What *Heck* did not answer, however, is whether the favorable-termination rule applies to Section 1983 suits filed by *former* prisoners who are no longer in custody and, therefore, cannot bring postconviction challenges. *Id.* at 500 (Souter, J., concurring) ("If [individuals not 'in custody'] . . . were required to show the prior invalidation of their convictions or sentences in order to obtain § 1983 damages for unconstitutional conviction or imprisonment, the result would be to deny any federal forum for claiming a deprivation of federal rights."); *see also Muhammad v. Close*, 540 U.S. 749, 752 n. 2 (2004) (per curiam). Four years after *Heck* was decided, five members of the Supreme Court confirmed in concurring and dissenting opinions that "*Heck* did not hold that a released prisoner . . . is out of court on a § 1983 claim, and . . . it would be unsound to read either *Heck* or the habeas statute as requiring any such result." *Spencer v. Kemna*, 523 U.S. 1, 19 (1998) (Souter, J., concurring, joined by O'Connor, Ginsburg, and Breyer, JJ.); *see also id.* at 25 n. 8 (Stevens, J., dissenting).

Erma is exactly the sort of "released prisoner" the *Spencer* opinion contemplated. By the time Erma learned of Petty's misconduct, her eight-year suspended sentence had long since ended and she was no longer in custody. Therefore, Erma could not have challenged her conviction through habeas

or on direct appeal, and, as a plurality of the *Spencer* Court recognized, she "may bring a § 1983 action establishing the unconstitutionality of [her] conviction . . . without being bound to satisfy a favorable-termination requirement that it would be impossible as a matter of law for [her] to satisfy." *Id.* at 21 (Souter, J., concurring). Any other result would deprive plaintiffs like Erma of any remedy for constitutional harms. *Id.* Seven circuit courts agree, holding that the favorable-termination requirement does not apply to those who are not in custody, such as Erma. *See Huang v. Johnson*, 251 F.3d 65, 73–75 (2d Cir. 2001); *Wilson v. Johnson*, 535 F.3d 262, 265–68 (4th Cir. 2008); *Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 599–603 (6th Cir. 2007); *Carr v. O'Leary*, 167 F.3d 1124, 1127 (7th Cir. 1999); *Nonnette v. Small*, 316 F.3d 872, 875–77 (9th Cir. 2002); *Cohen v. Longshore*, 621 F.3d 1311, 1315–17 (10th Cir. 2010); *Harden v. Pataki*, 320 F.3d 1289, 1298 (11th Cir. 2003).

The Fifth Circuit has not adopted the view of these seven sister circuits. *See Randell v. Johnson*, 227 F.3d 300, 301–02 (5th Cir. 2000). Instead, in 2000, the court concluded that the favorable-termination requirement does apply to those not in custody because, in the court's view, that is what the "[*Heck*] Court unequivocally held." *Id.* at 301. In looking to *Spencer*, the court explained that, even if the concurring and dissenting opinions did suggest movement away from *Heck*, it was unwilling "to announce for the Supreme Court that it has overruled one of its decisions." *Id.* Notably, however, the Fifth Circuit has not reconsidered *Heck*'s application to those not in custody in a precedential opinion since, despite intervening opinions from the Supreme Court. *Cf. Soc'y of Separationists, Inc. v. Herman*, 939 F.2d 1207, 1211 (5th Cir. 1991) (explaining that one panel may overrule a prior panel following a superseding decision of the Supreme Court). On the one hand, *Randell* is premised on the idea that the *Heck* Court "unequivocally" applied the favorable-termination rule to Section 1983 plaintiffs like Erma; yet, in *Muhammad*, for example, a unanimous Supreme Court expressly explained that it has not yet "settle[d] the issue" of whether the "unavailability of habeas . . . may also dispense with the *Heck* requirement." 540 U.S. at 752 n.2. These two conclusions—an unequivocal rule and an unsettled

issue—cannot both be true, and the Supreme Court's interpretation of its own precedent must control.[4] *See Kozam v. Emerson Elec. Co.*, 739 F. Supp. 307, 310 (N.D. Miss. 1990) (finding, "despite the dictates of *stare decisis*," that intervening Supreme Court precedent superseded Fifth Circuit authority); *MCI Telecomms. Corp. v. United Showcase, Inc.*, 847 F. Supp. 510, 513 (N.D. Tex. 1994) (considering whether Supreme Court decisions were intervening authority, even though the Fifth Circuit opinion decided after the Supreme Court precedent did not cite them as such).

Therefore, in accordance with the *Spencer* plurality, *Muhammad*'s unanimous holding, and at least seven circuit courts of appeal, this Court should find that Erma's claims are not *Heck* barred.

## II.    Erma properly alleged harms resulting from Defendants' misconduct.

Defendants next argue that Erma must "allege how Petty's involvement caused her conviction" for her to state an actionable claim. *See* ECF 16 at 8. This is incorrect for at least three independent reasons.

*First*, Erma has already alleged that, but for the pervasive due-process violations at her trial, she would not have been convicted. *See, e.g.*, Compl. ¶ 126. For purposes of a motion to dismiss, that allegation controls, and her complaint cannot be dismissed.

*Second*, even if Erma had not sufficiently alleged that these due-process violations caused her conviction, she was not required to. Instead, once Erma establishes that her due-process rights were violated (as she has easily done here[5]), the burden shifts to Defendants to prove that she would have been convicted anyway. *See, e.g.*, *Hill v. City of Pontotoc*, 993 F.2d 422, 425–26 (5th Cir. 1993). As *Hill* makes clear, in due-process cases like this one, Defendants bear the burden of showing that the

---

[4] A panel of the Fifth Circuit rejected an argument similar to this in an unpublished decision (while also signaling its doubts that *Randell* was correctly decided). *See generally Black v. Hathaway*, 616 F. App'x 650 (5th Cir. 2015) (unpublished). Of course, an unpublished opinion is merely persuasive, not binding, authority on this Court. *See Omega Hosp., LLC v. United HealthCare Servs., Inc.*, No. 16-cv-560, 2020 WL 7049857, at *17 (M.D. La. Dec. 1, 2020).

[5] In fact, Defendants do not dispute that Petty's actions violated Erma's due process rights.

procedural violations did not cause any injury. *Id.* at 426. Because Defendants cannot carry an affirmative evidentiary burden at the 12(b)(6) stage, Erma's complaint cannot be dismissed.

*Third*, even if Defendants were right—even if Erma would still have been convicted had she received a constitutionally adequate trial—that at most speaks to the *amount* of damages Erma could receive after judgment is rendered in her favor. Under *Carey v. Piphus*, she would still be entitled to at least $1 in nominal damages for the due process violation. 435 U.S. 247, 266–67 (1978). Her complaint therefore cannot be dismissed for that reason as well.

Indeed, the only case Defendants can muster in support of their position is *Hendershott v. Strong*, 753 F. App'x 320 (5th Cir. 2019) (unpublished). But *Herndershott* is an unpublished, inapposite case standing for the unremarkable proposition that a plaintiff who claims he was denied access to the courts must have been denied access to the courts. *Id.* at 320 (citing *Lewis v. Casey*, 518 U.S. 343, 349–54 (1996)). Fair enough. But neither *Hendershott* nor the case it cites require a plaintiff making an access-to-the-courts claim to show that he *would have prevailed* had he been allowed access. Nor could they, given the controlling precedent cited above. *Hendershott* might have some relevance here if Erma's due process rights had never been violated. But the Complaint clearly alleges that her due process rights were violated: She was denied a fair trial. That is a completed injury for which she is entitled to seek a remedy. *See, e.g.*, *Piphus*, 435 U.S. at 266 ("[T]he right to procedural due process is 'absolute' in the sense that it does not depend on the merits of a claimant's substantive assertions.").

### III. Erma alleged that Midland County had a nearly two-decades-long policy or custom of allowing Petty to work as both a prosecutor and law clerk in violation of due process.

For nearly two decades, Midland County had a policy or custom of allowing Petty to work as a prosecutor for the Midland County District Attorney's Office and a law clerk for the District Judges in his own cases and in other cases where his full-time employer—the District Attorney's Office—was a party. Compl. ¶ 144. Defendants' suggestion otherwise lacks merit.

Defendants raise two arguments against Erma's municipal liability claim under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). First, Defendants argue that Erma has not identified an action that was the cause of "the alleged harm (the alleged wrongful conviction)." ECF 16 at 10. Second, they argue that Petty was not a county official making a final policy decision for the County when he engaged in his dual role. Both arguments miss the point.

*First*, as Defendants note, municipal liability requires a plaintiff to plead that "municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." ECF 16 at 10 (quoting *Bd. of Cnty. Comm'rs. v. Brown*, 520 U.S. 397, 404 (1997)). Erma did just this. In her Complaint, Erma repeatedly alleges that Midland County had a policy or custom of allowing Petty to serve as a law clerk both in cases he was prosecuting and in cases, such as Erma's, where Petty's primary employer was a party. Compl. ¶¶ 63–82. Indeed, the Complaint alleges that the policy or custom was approved and confirmed in writing. *Id.* ¶¶ 64–71. And she has alleged, as explained further below, this practice deprived Erma of her constitutional right to a fair trial, which was a direct result of the County's policy or custom. *Id.* ¶¶ 129–53. These allegations satisfy the 12(b)(6) pleading standard.

*Second*, Defendants fail to recognize that municipal liability attaches when the municipality has "a persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted or promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984) (en banc) (per curiam). Erma has alleged just that. *See generally* Compl. ¶¶ 129–53.

The County was aware of, and took affirmative steps to facilitate, Petty's dual role for nearly twenty years. Multiple District Attorneys, the County Attorney, and the County Treasurer, among other County employees, were intimately aware of Petty's conflict of interest, and they enabled it to continue. They hired him knowing about his work for the District Judges; they executed an

employment contract authorizing him to continue his law clerk work (without limitation); they authored a memorandum telling the District Judges they could continue to hire Petty as a law clerk (despite his employment as a prosecutor); they signed his paychecks (for his prosecutorial work); they reviewed and paid his invoices (for his law clerk work); they issued him W-2s; they issued him 1099s; they explained his dual role to the IRS (at least in part); and they allowed this dual role to continue every day in between and until *Petty himself* made the decision to stop working in both roles. *Id.* This policy or custom of allowing Petty to work both sides of the bench was persistent—lasting for nearly two decades. It was widespread—affecting *hundreds* of cases. And it was common and well settled—continuing on a daily basis without objection from any County official or employee, including the policymakers who approved it.

Based on the facts alleged, there can be no doubt that Midland County had a policy or custom of allowing Petty to work as both a prosecutor and a law clerk sufficient to state a municipal liability claim. Likewise, there can be no doubt that this policy or custom caused Erma's injury here—the deprivation of her right to a fair trial. Without this policy or custom, Petty would not have been able to work as a law clerk in Erma's case while also working as an ADA for Midland County. Compl. ¶¶ 129–53. The employment relationship would have been prohibited, and he would not have been paid for his law clerk work.[6] Therefore, Erma has sufficiently pled a *Monell* claim.[7]

---

[6] The County does not argue that Erma failed to satisfy *Monell*'s culpability requirement, nor could it: It is only through deliberate indifference to the due process consequences of allowing a prosecutor to serve as a law clerk on his own and his employer's cases that the County could have permitted Petty to continue in both roles. *Cf. Brown v. Bryan County*, 219 F.3d 450, 462–63 (5th Cir. 2000). This is particularly true where Petty's employment agreement made sure to prohibit him from working as an attorney in cases that conflicted with the interests of the District Attorney's Office but permitted Petty's work for the District Judges without qualification. Compl. ¶ 65 & Ex. A.

[7] Alternatively, Erma has stated a *Monell* claim based on the actions of a final policymaker—District Attorney Schorre. Schorre knew about and expressly authorized Petty's dual role as part of Petty's employment contract with the District Attorney's Office. As the Fifth Circuit explained in *Brown v. Lyford*, "a district attorney with the final word on hiring or firing within the district attorney's office sets county policy regarding those decisions. That can then support *Monell* liability for the county."

**IV.   Petty is not entitled to immunity from suit.**

    **A.   Neither prosecutorial nor judicial immunity shield Petty from accountability.**

The heart of this case is that Defendants violated Erma's constitutional rights when they subjected her to a criminal process where the judge's law clerk was also a prosecutor. Remarkably, Petty attempts to invoke both prosecutorial and judicial immunity for this unconstitutional conflict of interest. In other words, Petty argues that his very means of violating the Constitution— simultaneously serving as a prosecutor and a law clerk—is a shield against constitutional accountability because, in his view, where his prosecutorial immunity runs out, judicial immunity steps in. In fact, neither doctrine applies.

    **i.   Petty is not entitled to prosecutorial immunity.**

While Petty correctly notes that prosecutors are generally immune from suit for their prosecutorial actions,[8] *see* ECF 16 at 12, he fails to explain that prosecutorial immunity is not available for claims that arise from conduct that is not part of the prosecutorial function. *See Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993) (concluding immunity does not apply to "administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings"). In fact, Petty offers no more than a single sentence regarding prosecutorial immunity, failing to adequately raise the issue. *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) ("A party who inadequately briefs an issue is considered to have abandoned the claim.").

As the Supreme Court explains, "the actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor." *Buckley*, 509 U.S. at 273. Under the "functional

---

243 F.3d 185, 192 (5th Cir. 2001).

[8] A Fifth Circuit opinion recently called into doubt the propriety of prosecutorial immunity as a constitutional matter. *Wearry v. Foster*, 33 F.4th 260, 278–80 (5th Cir. 2022) (Ho, J., dubitante). Referring to prosecutorial immunity as part of the "unholy trinity" of judge-made immunity doctrines—alongside municipal and qualified immunity—Judge Ho explained that prosecutorial immunity is unrooted in common law and wrongly kills legitimate lawsuits. *Id.*

approach" that the Fifth Circuit applies to prosecutorial immunity, the immunity applies only to actions "which occur in the course of [the prosecutor's] role as an advocate for the State." *Singleton v. Cannizzaro*, 956 F.3d 773, 779–80 (5th Cir. 2020); *see also Wearry v. Foster*, 33 F.4th 260, 269–72 (5th Cir. 2022) (denying prosecutorial immunity for fabricating evidence).

Petty's decision to clerk for Judge Hyde in Erma's case falls far outside the prosecutorial function. While his special relationship with Judge Hyde certainly benefited Petty and his fellow prosecutors, his decision to work as a law clerk in a case where his full-time employer was also a party and the work he performed as a judicial clerk on Erma's case—the actions that deprived Erma of her constitutional right to a fair trial—were not "preparation for the initiation of a prosecution or for judicial proceedings." *Buckley*, 509 U.S. at 273. Therefore, Petty is not entitled to prosecutorial immunity for his work as a conflicted law clerk in Erma's case.

### ii.  Petty is not entitled to judicial immunity.

Likewise, although judicial immunity generally protects judges (and their law clerks) from suit for their judicial decisions, it does not apply (1) when a judge acts in the "clear absence of all jurisdiction," *Stump v. Sparkman*, 435 U.S. 349, 356–57 (1978); or (2) when a claim arises out of "administrative decisions, even though they may be essential to the very functioning of the courts," *Forrester v. White*, 484 U.S. 219, 228 (1988). Yet, again, Petty did not elaborate on judicial immunity's applicability to the facts of this case, abandoning this argument. *See* ECF 16 at 12.

Again applying the functional approach, the Supreme Court held that judicial immunity did not protect a judge who demoted and discharged an employee for allegedly discriminatory reasons. *Forrester*, 484 U.S. at 229. The Court recognized that employment decisions, though important to the adjudicative system, were not themselves judicial or adjudicative. *Id.* Personnel decisions simply do not "give rise to absolute immunity from liability in damages under § 1983." *Id.* To the contrary, the Court emphasized that "[a]bsolute immunity . . . is strong medicine, justified only when the danger of

16

officials' being deflected from the effective performance of their duties is very great." *Id.* (cleaned up). Similarly, law clerks only enjoy judicial immunity "when assisting the judge in carrying out [his] judicial functions." *Mitchell v. McBryde*, 944 F.2d 229, 230 (5th Cir. 1991). The purpose of extending this immunity is to protect clerks from "[t]he danger that disappointed litigants . . . will vent their wrath on . . . judicial adjuncts." *Id.* at 231 (internal quotation omitted).

Petty's decision to serve as a law clerk in cases where his employer was a party is akin to the administrative or personnel decisions that the Supreme Court held were not entitled to judicial immunity. Similarly, Petty is not entitled to judicial immunity for consulting with his fellow prosecutors on Erma's case despite his *ex parte* relationship with Judge Hyde regarding the same, which is decidedly *not* part of a law clerk's role in carrying out judicial functions. Erma's claim against Petty does not challenge his or Judge Hyde's judicial decisions on her case (nor does it challenge the fact that she was prosecuted generally); instead, it argues that Petty simply should not have been the law clerk on her case. He should not have made an employment decision that gave even the appearance of impropriety, nor should he have acted as a law clerk while also communicating with and advising the lead prosecutor on Erma's case, which, in turn, deprived Erma of her constitutional right to a fair trial. Because Erma's claim against Petty does not challenge his adjudicative decision-making and does not endanger the effective performance of judicial duties, judicial immunity does not apply.

\*     \*     \*

Prosecutorial and judicial immunity do not protect Petty from liability because his violative actions were not part of being an advocate for the State or rendering judicial decisions, and Petty has not engaged with his burden to show that absolute immunity is otherwise "justified by overriding considerations of public policy." *Forrester*, 484 U.S. at 224. To hold otherwise would permit Petty to use his unconstitutional conduct as the shield against accountability for that same conduct.

### B. Petty is not entitled to qualified immunity.

Petty purports to invoke qualified immunity "to the extent necessary" in a single sentence of the conclusion of Defendants' brief, providing no explanation of how the doctrine would apply here and therefore waiving the defense. *See Stewart v. Tilley*, No. 6:15-cv-7, 2017 WL 5665336, at *6 (W.D. Tex. Nov. 27, 2017) (explaining that "a defendant *must actually plead*" qualified immunity with sufficient particularity). But even a properly raised qualified immunity defense would fail. At this stage, a plaintiff need only plead sufficient facts to show that the government official violated a clearly established right. *Westfall v. Luna*, 903 F.3d 534, 542 (5th Cir. 2018). This standard is easily satisfied here.

Erma has sufficiently pled that Petty's dual role in her case—working as both Judge Hyde's law clerk and an ADA and advisor for the District Attorney's Office prosecuting her case—violated her constitutional right to due process. *See Ex parte Young*, 2021 WL 4302528, at *5. And as the Supreme Court explained in *Hope v. Pelzer*, qualified immunity does not apply where the official had "fair warning that their alleged [behavior] was unconstitutional," even where the specific act in question has not been previously addressed by the courts. 536 U.S. 730, 741 (2002). Fair notice can come from a factually similar case, the reasoning (if not the specific facts) of prior cases, non-judicial guidance, and even the obviousness of the violation itself. *Id.* at 741–42, 744; *see also Taylor v. Riojas*, 141 S. Ct. 52, 53–54 (2020) (per curiam) (holding challenged conduct obviously unconstitutional despite a lack of fact-specific precedent); *McCoy v. Alamu*, 141 S. Ct. 1364 (2021) (mem.) (summarily reversing Fifth Circuit's grant of qualified immunity to prison official who pepper-sprayed prisoner for "no reason at all"); *Villarreal v. City of Laredo*, 17 F.4th 532, 540–41 (5th Cir. 2021) (denying qualified immunity to officers because unconstitutional behavior was "patently obvious").

Here, there is no doubt that Petty had fair notice that his dual role violated due process. The Supreme Court said as much in *Tumey v. Ohio*, 273 U.S. 510, 522 (1927) (emphasizing that judges may not have an interest, including a financial interest, in the controversy before them), and *In re Murchison*,

349 U.S. 133, 136–37 (1955) (holding unconstitutional potential for bias exists when the same person

serves as both accuser and adjudicator), as did the Fifth Circuit in *Hall v. Small Business Administration*,

695 F.2d 175, 179 (5th Cir. 1983) ("[T]he clerk is forbidden to do all that is prohibited to the judge. .

. . It is the duty of the law clerk as much as that of the trial judge to avoid any contacts outside the

record that might affect the outcome of the litigation." (internal quotations omitted)). *See also United*

*States v. Jordan*, 49 F.3d 152, 156–57 (5th Cir. 1995). And every code of ethics available to lawyers and

clerks, which every reasonable prosecutor and law clerk would be aware of, expressly prohibits Petty's

conduct here. *See, e.g.*, Tex. R. Prof'l Conduct 3.03–.05; *Code of Conduct for Law Clerks and Staff Attorney*

*of the Supreme Court of Texas* (Canon 5; Canon 7); Federal Judicial Center, *Maintaining the Public Trust:*

*Ethics for Federal Judicial Law Clerks* (Canon 3F1). Finally, above all else, the conflict of interest created

by an ADA being on a judge's payroll for a case his office is prosecuting is outrageous, and "[t]he

unconstitutionality of outrageous conduct obviously will be unconstitutional." *Safford Unified Sch. Dist.*

*No. 1 v. Redding*, 557 U.S. 364, 377 (2009). Simply, there can be no doubt that every reasonable

prosecutor would have fair notice that simultaneously working as an ADA and law clerk violates the

Constitution's guarantee of due process. Therefore, Petty is not entitled to qualified immunity.

### V. Erma's claim accrued, at the earliest, in February 2021 when she first had reason to know that Defendants deprived her of due process.

In arguing that Erma's claims have either not accrued or are time-barred, Defendants

obfuscate—and in turn misunderstand—a simple principle: Erma had two years from early 2021 to

file this lawsuit. And she beat the buzzer by at least 10 months.

To determine the limitations period for a Section 1983 claim, courts look to state law. *Pete v.*

*Metcalfe*, 8 F.3d 214, 217 (5th Cir. 1993). Texas law applies to this case, so the limitations period is two

years. *Id.* When that limitations period begins to run, however, is determined by federal law. *Id.* And

federal law states that a Section 1983 cause of action accrues "when the plaintiff knows or has reason

to know of the injury which is the basis of the action." *Id.* (internal quotation omitted).

As discussed throughout, the constitutional injury here is the denial of Erma's right to a fair trial, caused by Petty's dual role as a law clerk on her case and a prosecutor for the District Attorney's Office. While that injury may have actually occurred at the time of her criminal proceedings in the early 2000s, Erma did not learn about the injury until April 2021, two months after the earliest widespread coverage of Mr. Young's habeas application—and in turn Petty's misconduct—appeared in a *USA Today* article. Before then, Erma did not know—and could not have known—any of the facts underlying this suit. No one disclosed Petty's dual role to Erma or her counsel, and there was nothing that would have caused her to suspect his involvement in her case prior to early 2021.

Defendants do not claim otherwise. They do not allege that Erma could have possibly *known* about the injury sooner. Instead, they confusingly acknowledge that "a claim accrues and the limitations period beings to run the moment the plaintiff becomes aware that he has suffered an injury"; they then note that Erma's injury "occurred *years* ago," so her claims are time-barred. ECF 16 at 13–14 (internal quotation omitted) (emphasis in original). Erma agrees with the first two statements. Her claims did not accrue until she knew she had been injured. And she was injured years ago. But, also, Erma did not know and could not have known that she was injured—that she was denied a fair trial—until after she learned about Petty's dual role, which she did not know and could not have known until early 2021. Because Erma filed this case on April 12, 2022, merely 14 months after the soonest date she could have reasonably known the facts underlying this suit, her claims are not time-barred. Nothing in Defendants' motion contends otherwise.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied.

Dated: June 1, 2022.                Respectfully submitted,

                                             /s/ Alexa L. Gervasi
                                             Alexa L. Gervasi* (NY Bar No. 5536925)
                                             Jaba Tsitsuashvili* (CA Bar No. 309012)
                                             Robert J. McNamara* (VA Bar No. 73208)
                                             Anya Bidwell (TX Bar No. 24101516)
                                             INSTITUTE FOR JUSTICE
                                             901 N. Glebe Rd., Suite 900
                                             Arlington, VA  22203
                                             Tel.: (703) 682-9320
                                             Email: agervasi@ij.org
                                                           jtsitsuashvili@ij.org
                                                           rmcnamara@ij.org
                                                           abidwell@ij.org

                                             *Admitted *Pro Hac Vice*

                                             *Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 1st day of June, 2022, a true and correct copy of the foregoing was filed electronically using the Court's CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ Alexa L. Gervasi
Alexa L. Gervasi